**E-FILED**
Friday, 30 March, 2007  03:36:45 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

| | | |
|---|---|---|
| ERVEY RODRIGUEZ, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-cv-4070-JBM |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is the Plaintiff's Motion Summary Judgment [Doc. 12] and Defendant's Motion for Summary Affirmance [Doc. 15].   For the reasons set forth below, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Affirmance is GRANTED.

### BACKGROUND

Plaintiff, Ervey Rodriguez Jr., filed applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) on May 31, 2002.[1]  Rodriguez alleged disability is due to an anxiety disorder and panic attacks and his alleged disability onset date is January 11, 2002.

---

[1] Plaintiff previously filed applications for Social Security Disability Insurance and Supplemental Security income on April 25, 2001, alleging a date of onset of disability of Sept. 30, 1999. In a Notice of Disapproved Claims dated Sept. 26, 2001, the Plaintiff was determined to be not disabled and was denied his claim for benefits.

The record shows that Rodriguez started receiving psychological treatment at the age of 16, when he was first evaluated due to panic attacks and crying spells.  Beginning in October 1997, at the age of 22, Rodriguez began treatment at the Robert Young Center for Community Mental Health.  During his treatments at Robert Young, Dr. Eric J. Ritterhoff, M.D. was Rodriguez's treating psychiatrist.  The Doctor saw Rodriguez at least nine times during the course of treatment.  (Tr. at 23.)

Clinical progress notes indicate Rodriguez had one panic episode in 1999.[2]  Despite the panic attack in 1999, Rodriguez reported his anxiety to be well controlled with medication.  At that time, Rodriguez's music group was in the process of producing a CD and had travel dates to Chicago, Texas and Cancun planned with his band.  (Tr. at 23.)  Rodriguez's treating psychiatrist observed that the Plaintiff communicated well, responded positively to insights, and did not show significant agitation, anxiety or pressured speech.  Rodriguez also reported experiencing no problems with sleep or dysphoria at the time. (Tr. at 23.)

Through early 2000, Rodriguez's attitude remained positive and his thinking was goal-oriented and pleasant.  Rodriguez moved to San Antonio, Texas in the summer of 2000, and did not

---

[2] Although Rodriguez reported visiting Robert Young Center for Community Mental Health later, progress reports were not provided after April 24, 2001.

see Dr. Ritterhoff again until November of that year.  During
that visit, Rodriguez reported he was no longer traveling with
his band and their plans to tour in Cancun and elsewhere had
been scrapped.  Rodriguez also requested to resume his
medication during the visit.  (Tr. at 23-24.)

Once back on the medication, Rodriguez reported in April
2001 that he no longer experienced anxiety.  In May 2001,
Rodriguez was referred to a psychiatrist in San Antonio at El
Centro de Barrio.  Progress notes from the new psychiatrist
through September 2002 indicate that Rodriguez's judgment and
insight were fair, his memory was intact, speech coherent,
thoughts were goal-oriented, and his eye contact was good.  (Tr.
at 24.)

Per the request of Disability Determination Services,
Rodriguez was evaluated by Dr. Joe. H. Berry, M.D., on December
16, 2002.  During the evaluation, Rodriguez reported he was
still living in San Antonio with his new girlfriend, but was
also still supported monetarily by his family in Illinois.  At
their meeting, Dr. Berry noted that Rodriguez exhibited a flat
affect, and looked and acted depressed, restless and ill at
ease.  (Tr. at 24.)

As a result of the evaluation, Dr. Berry diagnosed
Rodriguez with a recurring major depressive disorder; a panic
disorder with agoraphobia; and an obsessive-compulsive

personality disorder.  Despite the disorders, Dr. Berry believed
Rodriguez could eventually finish or accomplish tasks or
activities even with these distractions.  Dr. Berry noted that
Rodriguez improved on adequate medication.  At that time,
Rodriguez was on a prescription of .5 mg of Clonazepam three
times daily and 25 mg of Imipramine.  Dr. Berry speculated that
this was not adequate medication for controlling Rodriguez's
depression.  (Tr. at 24.)

Rodriguez testified that he moved back to Illinois in
November 2003, where he again took up residence with his parents
and helped care for his nieces.  He does not get paid for
babysitting his nieces and he does not work outside the home.
(Tr. at 24-25.)

In February 2003, Dr. Norvin Curtis, Ph.D., reviewed
Rodriguez's entire claim file and completed a Mental Residual
Functional Capacity Assessment form.  In his assessment, Dr.
Curtis indicated that Rodriguez has some moderate limitations in
mental functioning which would limit him to non-complex work
tasks.  (Tr. at 223.)  However, Dr. Curtis indicated that the
Plaintiff could relate to peers and supervisors, and could adapt
to routine work changes.  (Tr. at 223.)

Dr. Ritterhoff, Rodriguez's treating psychiatrist in
Illinois, completed his own Mental Functional Capacity
Assessment in October 2004.  According to Dr. Ritterhoff's

4

assessment, Rodriguez has a poor ability to complete a normal work day and week without interruptions from his psychologically based symptoms.  Dr. Ritterhoff also indicated Rodriguez exhibits a poor ability to understand, remember and carry out detailed instructions; a poor ability to set realistic goals or make plans independently of others; a poor ability to deal with stress of semi-skilled and skilled work; and only a fair ability to deal with normal work stress.  In contrast to the opinion of Dr. Berry, Dr. Ritterhoff believed Rodriguez's anxiety problems were significant even while on the proper medications.  Although Dr. Ritterhoff believed Rodriguez's overall psychological functioning deteriorated since 1999, he emphasized that Rodriguez showed a significant improvement in function when on the proper medication on a regular basis.  However, Dr. Ritterhoff believed Rodriguez's problems would cause him to be absent from work for more than four days per month.  (Tr. at 223-226.)

At the February 17, 2005 administrative hearing, Rodriguez testified that he attended high school until the 12th grade, at which point he dropped out due to his anxiety attacks, depression, and panic disorder.  (Tr. at 250.)  Thereafter, he was briefly home-schooled, (Tr. at 240) and eventually attempted to attend college at Lyco College.  However, he testified that

5

he had to drop out because he felt "confined" and "restricted" when he would go to class.  (Tr. at 254.)

Rodriguez testified that he started working in 1993 at the age of 17.  (Tr. at 251.)  With the exception of his first job in 1993, all of Rodriguez's subsequent jobs lasted four months or less.  (Tr. at 251.)  Rodriguez claimed that he missed two or three days per month because of his disorders, which accounted for the numerous short stints at his various jobs.  (Tr. at 251.)  Some of the jobs Rodriguez had included customer service representative, security guard, hotel clerk, city park worker, retail salesperson, and a cook's assistant.  (Tr. at 21.)

Rodriguez testified at his hearing that he experienced panic attacks two to three times per month.  He also testified he was still taking epinephrine as well as Clonazepam for his anxiety.  (Tr. at 256.)  According to Rodriguez, the medication "makes him a bit sleepy," (Tr. at 258) and, as a result, he claimed he cannot operate a car (Tr. at 257).  Rodriguez also reported smoking marijuana twice a month, often when he would visit his friends.  (Tr. at 256.)

During his meeting with Dr. Berry in December 2002, Rodriguez reported his general daily activities included graphic art classes on the internet, household chores, playing guitar, preparation of meals, reading the Bible, watching television and surfing the internet.  Outside of the home, Rodriguez attended

mass daily at a church near his home and shopped with his girlfriend in the evening.  (Tr. at 24.)  At his hearing, Rodriguez reported he was now living at home, was not working, but still baby-sits his nieces - though not for pay. (Tr. at 255.)

Marian Jacobs, a vocational expert, also testified at Rodriguez's administrative hearing.  The ALJ offered Jacobs two hypotheticals.  First, the ALJ presented Jacobs with a hypothetical of an individual male aged 29 with a GED, with Rodriguez's vocational characteristics, no exertional limitations, a stress tolerance level of 3 (out of 10, 1 being the least stress tolerant), who would require a job with no contact with the general public and limited contact with co-workers.  (Tr. at 264-65.)  When asked if such an individual could perform any of Rodriguez's previous jobs, Jacobs testified that such an individual could perform the job of city park worker, though the other jobs Rodriguez had held would be precluded because of significant contact with the public or greater than mild stress levels.  (Tr. at 265.)  Jacobs also testified there were unskilled jobs that such a hypothetical individual could perform, including document preparer of microfilming materials (which is often performed at night), industrial cleaner, or stocker of merchandise at a warehouse. (Tr. at 265-66.)

For the second hypothetical, the ALJ described for Jacobs a
hypothetical individual with the same limitations as in the
first, but also included the limitation of being absent from
work four or more days per month because of mental depression or
mental impairment.  The additional limitation reflected Dr.
Ritterhoff's opinion regarding Rodriguez's limitation.  (Tr. at
266.)  Jacobs indicated that this hypothetical person would be
unable to perform any of Rodriguez's previous jobs.  (Tr. at
266.)  Likewise, there would be no jobs of an unskilled nature
this person could perform.  (Tr. at 266.)

On May 19, 2005, the ALJ made the following findings:
Rodriguez met the disability insured status requirements of the
Act on January 11, 2002 through September 30, 2004 and Rodriguez
had not engaged in substantial gainful activity since January
11, 2002.  According to the ALJ, the medical evidence suggested
that Rodriguez has a severe affective disorder and a severe
anxiety-related disorder.  Furthermore, as a result of his
mental impairments, Rodriguez has the following ailments: mild
to moderate restriction of his activities of daily living; mild
to moderate difficulties in maintaining social functioning; and
mild to moderate difficulties in maintaining concentration,
persistence or pace.  (Tr. at 21-22.)

Despite these impairments, the ALJ found the evidence of
record did not establish sufficient limitations to satisfy the

8

"C" criteria, and the claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in the regulations.  The ALJ also found the allegations and hearing testimony regarding the intensity and severity of symptoms were not credible.  According to the ALJ, Rodriguez retained the residual functional capacity to perform tasks at a low stress level, with no contact with the general public, and limited contact with fellow co-workers.  The ALJ found that Rodriguez could perform his previous job as a city worker, as well as other unskilled jobs.  (Tr. at 22.)

Given all of the above, the ALJ determined Rodriguez was not under a "disability" within the meaning of the Social Security Act at any time since his onset date of January 11, 2002.  Rodriguez appealed the ALJ's decision and the Appeals Council denied his request for review. (Tr. at 6.) Rodriguez thereafter filed this action for review of the ALJ's decision denying his benefits.  Rodriguez has now moved for summary judgment, and the Commissioner has moved for summary affirmance.

## LEGAL STANDARD

To be entitled to disability insurance benefits under the Social Security Act, a claimant must prove that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

9

expected to last for a continuous period of not less than twelve
months.  42 U.S.C. 423(d)(1)(A).  The Commissioner of Social
Security engages in a factual determination in concluding
whether the claimant is unable to engage in any substantial
gainful activity.  See McNeil v. Califano, 614 F.2d 142, 143
(7th Cir. 1980).  The factual determination is made by using a
five-step sequential analysis.  See 20 C.F.R. §§ 404.1520;
Maggard v. Apfel, 167 F.3d 376 (7th Cir. 1999).

    In the first step, a threshold determination must be made
to decide whether the claimant is presently involved in a
substantially gainful activity.  20 C.F.R. § 416.920(b).  If the
claimant is not under such employment, then the Commissioner of
Social Security continues to step two.  Id.  For the second
step, the Commissioner evaluates the severity and duration of
the claimant's impairment.  20 C.F.R. § 416.920(c).  If the
claimant has an impairment that significantly limits their
physical or mental ability to do basic work activities, then the
Commissioner will proceed to step three.  Id.  Under the third
step, the Commissioner compares the claimant's impairments to a
list of impairments considered severe enough to preclude any
gainful work, and if the elements on the list are met or
exceeded, declares the claimant eligible for benefits.  20
C.F.R. § 416.920(d).  If the claimant does not qualify under one

of the listed impairments, the Commissioner proceeds to the fourth and fifth steps.

In step four, the claimant's residual functional capacity is evaluated to determine whether the claimant can pursue her past work.  20 C.F.R. 416.920(e).  If the claimant cannot perform past work, then the Commissioner evaluates the claimant's ability to perform other work available in the economy.  Id.  The claimant has the burdens of production and persuasion on steps one through four.  However, once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show an ability to engage in some other type of substantial gainful employment.  See Tom v. Heckler, 779 F.2d 1250, 1253 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir. 1984).

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g), which provides that the finding of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." Maggard, 167 F.3d at 379 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1970)).

A court's function on review is not to try the case de novo or to supplant the ALJ's finding with the Court's own assessment

11

of the evidence.  See Pugh v. Bowen, 870 F.2d 1271, 1274 (7th Cir. 1989).  A court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied.  See Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).

Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous.  See Imani v. Heckler, 797 F.2d 508, 510 (7th Cir. 1986).

The Court's primary job in reviewing the ALJ's decision is to ensure the ALJ articulated reasons for rejecting or accepting entire lines of evidence.  Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000) (ALJ's failure to adequately address evidence that was contrary to his decision merited reversal); Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994) (ALJ erred by failing to discuss evidence regarding claimant's hand dexterity problems).  The ALJ is required to "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993) (quoting Stephens v. Heckler, 766 F.2d 284, 287 (7th Cir. 1985)).

## ANALYSIS

In this case, the ALJ found that Rodriguez first failed at step three of the five step inquiry because he "show[ed] no evidence of an impairment that meets or equals the criteria of a listed impairment or of a combination of impairments equivalent in severity to a listed impairment." (Tr. at 22.) The ALJ also found that Rodriguez failed at the fourth step of the inquiry because he retained the residual functional capacity to perform the requirements of his past relevant work, namely that of a city park worker. Finally, the ALJ determined that Rodriguez could perform other work in the national economy.

The Plaintiff challenges the ALJ's findings on the three following grounds: (1) the ALJ erred in his assessment of treating opinion evidence, (2) he failed to draw a logical connection with substantial evidence between medical opinions and his finding of residual functional capacity, and (3) he erred by posing a hypothetical to the vocational expert that did not accurately describe the claimant's limitations. Based upon the legal standard discussed *supra,* the question underlying each of these issues is whether the ALJ sufficiently articulated his reasons for discounting the treating physician's opinion regarding Rodriguez's limitations, and whether those articulated reasons were supported by substantial evidence in the record. In each of the three issues raised, the ALJ did sufficiently

articulate his reasons and those reasons were supported by substantial evidence in the record.

### I.   The ALJ properly weighed the evidence before him in compliance with the regulations.

The Plaintiff argues essentially two grounds in support of his assertion that the ALJ erred in evaluating the opinion evidence before him, namely that: (1) the ALJ improperly discounted the treating physician's testimony without substantial evidence in the record, and (2) the ALJ failed to re-contact the treating physician as required by the regulations.

### A.   The ALJ decision to reduce the weight of the treating physician's opinion is supported by substantial evidence in the record.

An ALJ must give controlling weight to the medical opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with the other substantial evidence.  20 C.F.R. § 404.1527(d)(2); Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).  When a treating physician's views do not meet this standard, the ALJ may discount the opinion because a claimant is not entitled to disability benefits simply because his physician states that he is 'disabled' or unable to work.  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).  An ALJ may also consider evidence from other non-examining doctors, and "when

treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence supports that decision." Id. at 1178.  Finally, if a treating physician's opinion is internally inconsistent or inconsistent with the opinion of a consulting physician, the ALJ may discount the treating physician's opinion as long as he minimally articulates his reasons for crediting or rejecting evidence of disability.  Skarbek v. Barnhart, 390 F.3d 500, 503 (7th Cir. 2004) (quoting Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000)).

Dr. Eric Ritterhoff is Rodriguez's treating psychiatrist and he has seen Rodriguez at least nine times over a span of more than five years.  In his mental functional capacity assessment, Dr. Ritterhoff indicated Rodriguez had a poor ability to complete a normal work day without interruptions from his symptoms; a poor ability to understand, remember, and carry out detailed instructions; a poor ability to set realistic goals or make independent plans; and only a fair ability to deal with normal work day stress.  In the opinion of Dr. Ritterhoff, Rodriguez's limitations would force him to miss four or more days of work per month even when on proper medication. According to the vocational expert who testified at the hearing, such impairments would completely preclude Rodriguez from obtaining any employment.

15

In the case at bar, however, the ALJ concluded Dr. Ritterhoff's opinion regarding Rodriguez missing four or more days per month was not supported by clinical findings or laboratory studies.  In addition, it was inconsistent with the record as a whole and was also inconsistent with the opinions of other consulting physicians.  As a result, the ALJ gave little weight to Dr. Ritterhoff's mental functional capacity assessment. Instead, the ALJ determined that Rodriguez could perform work at a low stress level when such work involved no contact with the general public and limited contact with fellow co-workers. (Tr. at 27)

There is substantial evidence in the record to support the ALJ's determinations.  First, Dr. Ritterhoff previously observed that Rodriguez's symptoms of anxiety improved when he took his proper medication.  (Tr. at 170.)  Indeed, Rodriguez admitted as much in an April 2001 visit when he reported to Dr. Ritterhoff that he did not experience anxiety when he used his medication. (Tr. at 23.)  Furthermore, during the course of his treatment, Rodriguez would go off his medication whenever he felt he was doing better, only to request later that Dr. Ritterhoff put him back on it.  Accordingly, the ALJ stated that the evidence suggested the claimant was not entirely compliant in taking prescribed medications.  This suggested that his symptoms may

16

not have been as limiting as the claimant alleged.  (Tr. at 25-26.)

Dr. Ritterhoff's conclusions regarding Rodriguez's functional capacity are also contradicted by the opinions of two other consulting physicians.  Dr. Joe Berry (the physician who examined Rodriguez at the request of the state agency) concluded that Rodriguez's anxiety symptoms, while recurrent, improved with medication.  Dr. Berry also noted that Rodriguez was not receiving proper medication for his depression when he evaluated Rodriguez in 2002.  In addition to Dr. Berry, Dr. Norvin Curtis reviewed Rodriguez's entire file in February 2003 and completed a Mental Residual Functional Capacity Assessment form.  Dr. Curtis indicated Rodriguez had some moderate limitations in mental functioning that resulted in Rodriguez being limited to non-complex work tasks.  However, Dr. Curtis also found that Rodriguez could relate to peers and supervision and could effectively adapt to routine work changes.  Furthermore, Rodriguez himself testified at his hearing that he has been on and off his medication as he improved and regressed, which supports the Doctor's assessments that proper medication would allow for Rodriguez to adapt to work changes and perform low stress, non-complex tasks at work.

The Plaintiff here argues that the ALJ addressed Dr. Ritterhoff's opinion only summarily, and did not give enough

17

treatment in the opinion as to why he discounted Dr.
Ritterhoff's conclusions.  While the treatment of Dr.
Ritterhoff's opinion could certainly have been more detailed,
the ALJ detailed enough substantial evidence from other sources
to satisfy the minimal standards for articulating his
conclusion.  The ALJ noted evidence of improvement on medication
from multiple doctors, including Dr. Ritterhoff, other doctor's
contradictory opinions regarding Plaintiff's functional capacity
and Rodriguez's testimony admitting to a sporadic usage of his
medication.  Collectively, these notations provide substantial
evidence to support the ALJ's determination that Rodriguez could
perform work at a low stress level.  As a result, these
notations provide substantial evidence that Dr. Ritterhoff's
conclusions to the contrary were ripe for rejecting.  See, e.g.,
Becton v. Barnhart, 137 Fed. Appx. 897, 898 (7th Cir. 2005)
(noting that substantial evidence supported an ALJ's decision
when notes from the claimant's treating physicians showed the
claimant's depression improved with medication and mental status
evaluations concluded the claimant could perform simple tasks
despite his depression).

     The Plaintiff also argues that the ALJ failed to take into
account the checkered work history of Rodriguez in support of
Dr. Ritterhoff's conclusion.  The Plaintiff notes he held 27
different jobs between 1993 and 2002 and argues that this shows

18

his persistence in trying to hold a job despite his
psychological limitations.  Furthermore, Plaintiff argues that
he was forced to quit his band after they produced a CD because
of his psychological symptoms.

However, the record shows the ALJ did account for
Rodriguez's work history when considering the weight to give
Rodriguez's testimony and Dr. Ritterhoff's opinion.  In the
ALJ's decision, the ALJ noted that a review of Rodriguez's work
history showed that he worked "only sporadically prior to the
alleged disability onset date which raises a question as to
whether his continuing unemployment is actually due to allegedly
disabling impairments."  (Tr. at 26.)

Accordingly, the ALJ's opinion provided a logical bridge
between the evidence on record and the ALJ's ultimate decision
disregarding the opinion of the treating physician.

   **B.**      **The ALJ was not required to recontact the
            treating physician under the present
            circumstances.**

Rodriguez argues the ALJ ran afoul of the regulations by
failing to recontact the treating physician when he discounted
Dr. Ritterhoff's testimony.  In support of this assertion,
Rodriguez cites 20 C.F.R. §§ 404.1512(e)(1) which states that
the ALJ is required to "seek additional evidence or
clarification from [a] medical source when the report from [the]
medical source contains a conflict or ambiguity that must be

19

resolved, the report does not contain all the necessary
information, or does not appear to be based on medically
acceptable clinical and laboratory diagnostic techniques." 20
C.F.R. §§ 404.1512(e)(1).  However, courts have noted that the
regulation does not impose a duty to seek "additional evidence"
unless the evidence received is inadequate to allow the ALJ to
reach a conclusion about whether the applicant is disabled.  See
Sutton v. Barnhart, 183 Fed. Appx. 555, 560 (7th Cir. 2006).

Here, as already noted, there was adequate evidence in the
record to make a sufficient determination as to whether
Rodriguez was disabled.  The Plaintiff does not point to any
legitimate reason why this evidence was inadequate to allow the
ALJ to reach a conclusion about whether the Plaintiff was
disabled.  Accordingly, the ALJ had no reason to believe the
evidence in front of him was incomplete, and there was no need
for the ALJ to recontact Dr. Ritterhoff.

**II.  The ALJ drew a logical connection between the medical
    opinions and his finding regarding the Plaintiff's RFC.**

At step four of the sequential analysis, the ALJ must
determine a claimant's residual functional capacity (RFC).  20
C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545.  Once the ALJ
determines a claimant's RFC, he compares the claimant's RFC with
the requirements of the claimant's past work.  20 C.F.R. §§
404.1520(e), 404.1560(b).  Past relevant work is "substantial

gainful activity" that is typically a job performed in the
previous fifteen years, and performed long enough to learn the
job.  20 C.F.R. § 404.1565(a).  If the claimant's past job did
not require him to perform activities in excess of his RFC, the
claimant is not disabled.  20 C.F.R. § 404.1520(e), 404.1560(b),
404.1561.

The Plaintiff again disputes the weight the ALJ assigned to
his treating physician at this stage.  The ALJ found that
Plaintiff had an RFC which would allow him to perform tasks at a
stress level of 3 on a scale of 1 to 10, with 10 being the
highest level of stress toleration.  In addition, the ALJ noted
Rodriguez would need a job with no contact with the general
public and limited contact with fellow co-workers.

The ALJ's conclusion regarding Rodriguez's RFC accurately
reflects the opinions of both Dr. Ritterhoff and Dr. Berry.  As
discussed above, both Doctors noted that Rodriguez improved when
on proper medication.  Also, both Dr. Berry and Dr. Norvin
Curtis noted that Rodriguez suffered only moderate limitations
in his functioning.  The ALJ ultimately gave more weight to the
opinion of Dr. Berry, whose diagnosis of moderate difficulty in
social or occupational functioning is accurately reflected in
the final RFC finding.  Accordingly, the ALJ had substantial
evidence to conclude that Rodriguez's depression and anxiety
disorders only caused Rodriguez to have limited functional

capacities in stressful working situations and did not lead to a
lower RFC.

The Plaintiff also argues that the ALJ's conclusion
regarding Rodriguez's RFC does not take into account Rodriguez's
agoraphobia or recurrent anxiety.  However, both of those
diagnoses were incorporated in Dr. Berry's evaluation and are
reflected in the extremely low stress level assigned to his RFC.
Also, the ALJ noted that the Plaintiff performed a number of
activities outside of the home, such as attending mass regularly
and shopping with his girlfriend.  Such activities suggested to
the ALJ that the agoraphobia had a limited impact on Rodriguez's
functional ability in the work place.

Finally, the Plaintiff claims that the ALJ did not
articulate the weight he assigned the medical opinions in
determining the RFC.  However, the record shows that the ALJ did
indicate what weight he gave to the opinions of the non-
examining physicians, including Dr. Berry, when determining the
Plaintiff's RFC.  The ALJ stated the treating physician's
findings were not entitled to controlling weight and the ALJ
supported his determination by pointing to significant
contradictory evidence.  The opinions of the non-examining
physicians, which do not face contradictory evidence, were
entitled to some weight.  (Tr. at 26.)  This is enough to
satisfy the minimal articulation requirements of allowing this

22

Court to trace a path between an ALJ's reasoning and the evidence before him.  Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993); See, also, David v. Barnhart, 446 F.Supp.2d 860 (N.D. Ill. 2006).

Accordingly, the ALJ properly grounded his RFC on substantial evidence presented in the record.

### III. The ALJ properly framed his hypothetical to the vocational expert with an accurate portrayal of the claimant's limitations.

Finally, the Plaintiff argues that the hypotheticals posed to the vocational expert were improper and constitute reversible error because the ALJ did not take into account all of Rodriguez's limitations.

An administrative law judge may rely on a vocational expert as long as the expert offers reliable testimony.  Young v. Barnhart, 362 F.3d 995, 1003 (7th Cir. 2004); David, 446 F.Supp.2d at 878.  For a vocational expert's testimony to be reliable, the hypothetical questions posed by the ALJ must include all limitations supported by medical evidence in the record.  Id.  However, where the vocational expert had the opportunity to learn of the claimant's limitations through an independent review of the medical records or through questioning at the hearing, the expert may offer reliable testimony even if the hypotheticals did not include every limitation.  Id.

At Rodriguez's hearing, the ALJ presented the vocational expert, Marian Jacobs, with two hypotheticals: one reflecting a person with the limitations of a low stress level, no exertional limitations, no contact with the public and limited contact with co-workers; and a second identical hypothetical with the stipulation that the person would miss four days of work per month.  Under the first hypothetical, Jacobs testified to a number of jobs that would be available to such a person.  Under the second hypothetical reflecting Dr. Ritterhoff's opinion, Jacobs testified that no employer would accommodate a worker missing four or more days per month.

In the case at bar, Jacobs had the opportunity to review the record and was present throughout the ALJ hearing.  (Tr. at 263-64.)  So, the ALJ may impute knowledge to Jacobs of everything in the exhibits and testimony.  Young, 362 F.3d at 1003; David, 446 F.Supp.2d at 878.  Therefore, even though the ALJ's hypothetical did not include certain limitations stated by the various doctors, the ALJ could properly assume that Jacobs included all of Plaintiff's limitations in his assessment of the number of jobs Plaintiff could perform.

Accordingly, Plaintiff's third and final argument does not provide legitimate grounds for reversing the ALJ's decision.

## **CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment [Doc. 12] is DENIED, and Defendant's Motion for Summary Affirmance [Doc. 15] is GRANTED.

ENTERED this  30th  day of March, 2007

                        s/Joe Billy McDade
                        Joe Billy McDade
                        United States District Judge